[No. 35624. *En Banc.* January 13, 1962.]

S. THATCHER HUBBARD, JR., *Appellant,* v. THE MEDICAL SERV-
ICE CORPORATION OF SPOKANE COUNTY *et al.,*
*Respondents and Cross-appellants.*\*

\*Reported in 367 P. (2d) 1003.

MALLERY, J., dissents.

*Geo. W. Young,* for appellant.

*C. C. Rowan* and *John D. MacGillivray,* for respondents and cross-appellants.

HILL, J.—This is an action for damages and injunctive relief. The plaintiff, who is a licensed physician in Spokane, alleged extensive financial losses in his practice as a result of the restraint of trade imposed upon the medical profession in Spokane County by the monopolistic practices of the defendants, The Medical Service Corporation of Spokane County (hereinafter called the corporation) and The Medical Service Bureau of Spokane County (hereinafter called the bureau).

The following statement of the case is taken, in most instances, practically verbatim from the trial court's findings of fact; and where any additional factual statement is deemed necessary we will so indicate.

The corporation is nonprofit and was organized in 1933 by nineteen physician members of the Spokane County Medical Society, and has operated what is generally known as a "medically sponsored health care program." Since 1947 the corporation has operated as a "Health care service contractor" under the provisions of RCW 48.44.010-060. As such health care service contractor, the corporation enters into agreements with employee groups whereby, in consideration of prepaying of designated premiums therefor, the corporation agrees to furnish to its subscribers medical, surgical and hospital services. The corporation operates in Spokane County and five adjoining counties.

Approximately eighty per cent of the population in that area is covered by some type of prepaid medical and hospital care insurance. Thirty per cent of the population are subscribers to contracts written by the corporation. Fifty per cent of the population are insured for such services under insurance contracts written by private insurance carriers.

The bureau is an unincorporated association of doctors of the Spokane area, also organized in 1933 for the purpose of cooperating with the corporation in securing medical and surgical care and treatment, hospital benefits and other allied health services for persons eligible therefor by reason of their contract relationship to the corporation; and to provide, through its members, medical and surgical services to subscribers of contracts offered by the corporation. At the present time, the bureau is composed of approximately 275 member doctors out of a total of approximately 300 doctors, licensed to practice in the area. Physician members of the bureau, by majority vote, adopt, and from time to time amend, their own rules, regulations and bylaws and operate under the "Constitution and By-laws of the Medical Service Bureau of Spokane County."

To the foregoing finding of the trial court, concerning the bureau, we would add that a member doctor is subject to the following rules pertinent to this case: He must refrain from associating professionally with or referring subscribers to a doctor who is not a member of the bureau; he must not enter into a contract for his services with any competing prepaid contract medical plan, though he may treat members of an indemnity type plan; he must not criticize bureau policies to subscribers or their relatives; he may not discuss with subscribers problems relating to the authorized fee schedule which may be thought to require adjustments; he may not hold a contract with industrial employers to service their employees for occupational injuries unless he refrains from treating subscriber-employees for nonoccupational conditions; all treatment, except routine office calls, must be approved in advance by the bureau, and charges for such treatment are subject

to review; and a doctor is limited by means of an "area average" to the number of subscribers he may treat and be paid for per month.

The corporation enters into health care service contracts only with groups of employees. Individual coverage is extended only if a firm whose employees are covered ceases business, or if a covered employee terminates his employment. In such case, coverage may be continued on an individual basis with an adjustment in premium. In its contract with the group covered, the corporation agrees that it will furnish the medical and surgical care provided by the contract and that for such services the subscriber will not be billed individually by the attending physician or surgeon.

The medical and surgical services, which the corporation in its contracts agrees to provide to its subscribers, are furnished by individual physician members of the bureau who, by contract with the corporation, have agreed to furnish such services to the corporation subscribers. In order to receive medical and surgical services under a corporation contract, a subscriber must receive those services from a doctor who is a member of the bureau and who has agreed with the corporation to furnish such services. Member physicians of the bureau enter into individual contracts with the corporation whereby the physician agrees to furnish medical and surgical services to all subscribers of health care contracts written by the corporation, to accept in full for his services the fees fixed by the corporation, and to abide by all rules and regulations governing the furnishing of such services adopted by the corporation. The medical and surgical fees provided are established by a fee committee composed of members of the bureau, and become effective on approval of the corporation. The fee schedule so adopted is, from time to time, reviewed and is at all times subject to change on recommendation to the corporation by the fee schedule committee.

The plaintiff, S. Thatcher Hubbard, Jr., is licensed to practice medicine in this state; is a member of the Spokane County Medical Society and the Washington State and

American Medical Associations. He specializes in anethesia, the treatment of allergies, and pulmonary diseases, but is also engaged in a general medical practice. October 14, 1949, he was admitted to membership in the bureau and entered into a written contract with the defendant corporation which provided in part that plaintiff would, upon request, treat all subscribers of the corporation, would accept in full for such services the fees provided by the corporation, would abide by all rules and regulations covering the furnishing of such services; and which contract further provided that it was subject to cancellation at any time without cause.

To this finding of the trial court, concerning Dr. Hubbard, we would add that subsequent to 1949 he developed a speciality in inhalation or pulmonary therapy. He established a laboratory with equipment which he employs in giving a certain treatment known as intermittent positive pressure breathing (IPPB). At the time the plaintiff began to give his IPPB treatments, the bureau had set no fee for it. As a result, the plaintiff could neither be paid by the bureau nor charge the subscriber patients for them. He requested that the bureau either exclude the treatments from the coverage of the subscriber's contract or set a bureau fee schedule for them. Finally, the bureau agreed to set a fee of four dollars a treatment and allow one a week. It is the plaintiff's contention that this was completely inadequate because the reasonable cost was $5.75 a treatment and patients sometimes needed as many as two or three treatments a day and, in average cases, several a week. The plaintiff was never able to gain full bureau acceptance of his IPPB treatments as standard medical practice. Finally, he began to bill the subscribers individually for the IPPB treatments. After repeated warnings failed to stop him, his contract was cancelled November 16, 1957, on the ground that he was double billing in violation of the bureau's regulation.

While not specifically so found, it is conceded that upon the cancellation of his contract by the corporation, and

pursuant to the bylaws of the bureau, his membership in the bureau was automatically terminated.

Dr. Hubbard then commenced this action, and by his complaint set out a cause of action seeking a permanent injunction restraining the defendants from continuing their monopolistic practices, a cause of action for damages in the amount of $180,000, and a third cause of action with which we are not now concerned.

The trial court dismissed the action for damages, from which judgment Dr. Hubbard appeals.

As to the cause of action which alleged that the operations of the corporation and bureau constitute a monopoly in violation of the Constitution of the State of Washington, Art. 12, § 22, the trial court found:

"The Corporation is operating within the purview of the health care services act of the State of Washington, filing its reports, contract forms, premium schedules and statement of reserves with the State Insurance Commissioner. The Corporation's operation is not monopolistic in nature, is not in the furtherance of any monopoly, does not fix prices or limit production in the field of medical or hospital care, does not operate in restraint of trade and its operation is beneficial rather than injurious to the general public." (Finding No. 7)

The trial court consequently refused to enjoin the continued operation of the corporation and the bureau.

The trial court did restrain the defendants from following their limited X-ray payment policy and from prohibiting industrial plant doctors from accepting plant employees as private patients. This had the direct effect of invalidating the bureau's rule No. 30, which will be discussed later in this opinion.

Dr. Hubbard appeals upon the theory that the operation of the bureau and corporation should be enjoined, and they cross-appeal upon the theory that there should be no injunction at all.

The appellant's cause of action for damages hinges upon the propriety of the cancellation of his contract by the corporation. The appellant claims the corporation breached the contract by a wrongful termination. The respondents

contend, and the trial court so found, that the appellant billed subscribers for the same services for which he was paid by the bureau and also for services which the subscribers were not entitled to receive under their contracts. The regulations of the bureau to which the appellant had agreed, prohibited such billing. This breach of the regulation was the reason for cancelling appellant's contract and the consequent termination of his membership in the bureau.

The findings of fact made by the trial court, on the issue of the propriety of the cancellation of the contract, are supported by substantial evidence. We therefore sustain them. *Thorndike v. Hesperian Orchards, Inc.* (1959), 54 Wn. (2d) 570, 343 P. (2d) 183.

The corporation was justified in cancelling the contract, which terminated appellant's membership in the bureau; accordingly, the trial court must be affirmed in denying appellant's claim for income lost by reason of such cancellation and termination. This, of course, also determines the lack of liability on the part of the officers and directors of the respondent bureau (who were made defendants) for their part in terminating appellant's relationship with the corporation and the bureau. *Sweeny v. Sweeny Inv. Co.* (1939), 199 Wash. 135, 90 P. (2d) 716, 139 A. L. R. 847.

The evidence supports the finding of the trial court, which we have quoted, to the effect that the corporation's operation is not monopolistic in nature, is not in the furtherance of any monopoly, and does not fix prices or limit protection, and that its operation is beneficial rather than injurious to the general public. This finding supports the trial court's refusal to enjoin the operation of the corporation and the bureau.

We agree with the respondents on their cross-appeal, that the two injunctions should not have been granted; however, we do not reach the merits on this issue. Dr. Hubbard, not being a member of the bureau, had no identifiable legal interest in determining what the bureau's policy should be relative to the payment for subscribers' X rays, and consequently, the trial court should not have enjoined

the operation of the regulation. As we said in *Washington Beauty College v. Huse* (1938), 195 Wash. 160, 164, 80 P. (2d) 403:

"It should be remembered that this court is not authorized to render advisory opinions or pronouncements upon abstract or speculative questions under the declaratory judgment act. The action still must be adversary in character between real parties and upon real issues, that is, between a plaintiff and defendant having opposing interests, and the interests must be direct and substantial and involve an actual as distinguished from a possible or potential dispute, to meet the requirements of justiciability."

See also *Kitsap Cy. v. Bremerton* (1955), 46 Wn. (2d) 362, 281 P. (2d) 841; *Adams v. Walla Walla* (1938), 196 Wash. 268, 82 P. (2d) 584.

The trial court also enjoined the enforcement of respondents' rule No. 30, which provides:

"No physician member of the Medical Service Bureau will be paid by the Bureau for services rendered any Bureau subscriber or dependents employed by a firm or plant in which that doctor does pre-employment examinations, re-examinations or treats patients on the premises of said employer."

The trial court found that:

"This rule has for its only purpose, the suppression of competition and it could as well be applied to any patient producing activity which a doctor may engage in. The Bureau is not intended to be and may not be used as an equalizer. This rule unfairly stifles competition. . . ."

If it were our function to determine what the bureau's rules should be, we could agree with the trial court as to the undesirability of rule No. 30; but, as we have just indicated, the cross-appellants are correct in their contention that Dr. Hubbard's membership in the bureau being at an end, he had no identifiable legal interest in determining or challenging the bureau's policy involved in the enforcement of rule No. 30, and the enforcement thereof cannot be enjoined in this proceeding.

As we said in *Porter v. King Cy. Medical Soc.* (1936), 186 Wash. 410, 58 P. (2d) 367, whether a bylaw or regu-

lation was just, reasonable, or wise is a question of policy which concerns only the medical society and its members. There is no contention that Dr. Hubbard was in any way affected by these regulations.

■ It is clear, however, that Dr. Hubbard has been, and is being, damaged by the refusal of the bureau to allow its doctors to refer patients to him. For our present purposes a division into *subscriber* patients and *nonsubscriber* patients has some significance. Though the bureau has no specific written regulation prohibiting such referrals, insofar as *nonsubscriber* patients are concerned, its rule prohibiting association with *nonmember* doctors has been given such an interpretation. This amounts to an attempt by respondents to prevent the referral of *nonsubscriber* patients to Dr. Hubbard, and it is in restraint of trade and is an illegal boycott which may be enjoined. *St. Germain v. Bakery & Confectionery Workers' Union No. 9 of Seattle* (1917), 97 Wash. 282, 166 Pac. 665; *Eastern States Retail Lbr. Dealers' Ass'n v. United States* (1914), 234 U. S. 600, 58 L. Ed. 1490, 34 S. Ct. 951; *United States v. American Medical Ass'n* (1940 C.A. D.C.), 110 F. (2d) 703; *Pratt v. British Medical Ass'n* (1919), 1 K. B. 244.

■ We recognize that as to *subscriber* patients the referral by doctors to bureau consultants is a proper part of such a medical plan, insofar as the doctor who makes the referral is satisfied that the interest of his patient is being adequately served thereby; however, no bureau regulation can be permitted to control the choice of consultants which the particular case demands. We said in *Group Health Cooperative of Puget Sound v. King Cy. Medical Soc.* (1951), 39 Wn. (2d) 586, 629, 237 P. (2d) 737:

"It is unquestioned that good professional practice, custom, and need call for as wide a choice of consultants and specialists as the particular case demands. This was conceded by witnesses who are affiliated with respondents. It has become increasingly true in recent years due to the trend towards specialization of personnel and the development of specialized equipment which is often relatively scarce in any one community. . . ."

If a *member* doctor believes that the service which Dr. Hubbard can render will be more beneficial to his *subscriber* patient than anything that can be secured through the bureau or its doctors, the *member* doctor has a higher obligation than loyalty to the bureau; public policy will not permit him to contract away his obligation to his patient, nor any association of doctors, in attempting to limit his consultative procedures.

Dr. Hubbard, as a *nonmember* of the bureau, is injuriously affected by its regulations and policies with reference to referrals. The bureau may determine what it will pay for, in the way of consultations and specialized forms of treatment, but it cannot be permitted to control the judgment of its doctor members as to what the particular case demands.

We affirm the dismissal of the action for damages; but modify the judgment by dissolving the injunctions relative to X-ray policy and rule No. 30; and remand for the entry of an order enjoining the bureau and the corporation from enforcing any policy or regulation which prevents the referral of a *nonsubscriber* patient to a *nonbureau* doctor, or which would prevent the referral of a *subscriber* patient to him by a bureau doctor, if that doctor believes that such referral would be more beneficial to his patient than any service that could be secured through a *member* of the bureau.

Each party shall bear his own costs.

FINLEY, C. J., DONWORTH, WEAVER, ROSELLINI, OTT, FOSTER, and HUNTER, JJ., concur.

MALLERY, J., dissents.

April 10, 1962. Petition for rehearing denied.